COLTRANE v. BALTIMORE BUILDING & LOAN ASS'N OF BALTIMORE
CITY.

In re CAULK et al.

(Circuit Court, D. Maryland. June 17, 1901.)

1. BUILDING AND LOAN ASSOCIATIONS—DISTRIBUTION OF ASSETS IN INSOLVENCY—
PREFERENCES AS BETWEEN MEMBERS.

A matured notice of withdrawal given by a member of a building.
association holding paid-up stock, as permitted by the terms of his con-
tract, does not operate to terminate his membership and convert him
into a creditor entitled to preference of payment over the other mem-
bers in the distribution of the assets of the association in insolvency,
contrary to the express provisions of the by-laws.

2. SAME—NOTICE OF WITHDRAWAL.

Where certificates of paid-up stock issued by a building association
gave the holder the right to withdraw and have his stock redeemed,
subject to the provisions of the by-laws of the association, which re-
quired 30 days' notice of intention to withdraw to be given, the status
of a holder of such a certificate as a member of the association is not
affected by a notice of withdrawal given less than 30 days before the
commencement of proceedings in insolvency against the association.

3. SAME—EFFECT OF GIVING NOTICE OF WITHDRAWAL.

Even where the by-laws of a building association give a holder of
paid-up stock the right to withdraw and receive the amount of his
stock on giving a stated notice, a member who has given such notice
as to stock which has matured, but not been paid, is entitled to no pref-
erence in payment over other members when the assets of the association
are taken in charge by a court of equity for distribution in insolvency
proceedings. The provisions of the by-laws prescribing the order in
which payments shall be made to the different classes of members in
the regular course of business apply only so long as the association is
a going concern, and do not govern the distribution of its assets in in-
solvency, and a member who has given notice of withdrawal is not by
that fact given any superior equity which entitles him to a preference
over others who have not.

In Equity. In the matter of the intervening petitions of Florence
A. Caulk and Helen M. Norris. On exceptions to report of John
C. Rose, special master.

The petitioners allege that they were the holders of full-paid stock in the
defendant association, and had given notice prior to the filing of the bill
in this case that they desired to withdraw their stock. The petitioners al-
leged that by giving such notice they became creditors of the association,
and were entitled to be paid in full out of its assets in preference to such
stockholders as had not given such notice. On the 17th day of September,
1900, the special master filed his report, making 38 findings of fact, and
reaching 7 conclusions of law. So much of these findings of fact as are
material to the questions raised by the exceptions may be briefly stated as
follows: The Baltimore Building & Loan Association was a Maryland cor-
poration. Among the various classes of stock issued by it was a full-
paid stock, for which the subscriber at the time of subscription paid its
full par value in cash. In the early years of the existence of the association,
upon this character of stock it contracted to pay interest or dividends at
the rate of 8 per cent. per annum, payable semiannually. Subsequently
it changed its by-laws so that upon all full-paid stock issued thereafter it
undertook to pay but 6 per cent. per annum, payable semiannually. The
change of by-laws did not purport to affect the rate of interest or dividend
payable on the full-paid stock issued before the change was made. The
petitioners were the holders of full-paid stock, some of it being the 8
per cent. stock, and some the 6 per cent. They had paid par value for that

stock, and they had received the interest or dividends which the association had agreed to pay. Mrs. Norris had given notice to the association on the 28th of February, 1900, that she desired to withdraw the full-paid shares held by her, and Mrs. Caulk gave a similar notice on the 16th day of March, 1900. The association acknowledged the receipt of these notices upon the days upon which they were respectively given. At no time subsequent to January 1, 1900, were the total assets of the association sufficient to have repaid to its stockholders the amount they had paid into it. On the 21st day of March, 1900, a receiver for the association was appointed by this court. The debts due by the association to persons other than its stockholders were trifling in amount. The by-laws of the association were amended from time to time. The provisions of such of them as are relevant to any of the questions in this controversy appear from the master's discussion of his conclusions of law. To the findings of fact no objection has been made. The intervening petitioners have excepted to the master's conclusions of law, which, with the reasons in support of them, were substantially as follows:

"First Conclusion of Law. If the amendments made in 1899 to the by-laws of the defendant corporation are binding upon the petitioners, the petitioners are not entitled, by reason of their having given notice of withdrawal, to any preference in payment over the stockholders who have not given such notice.

"Reasons for the First Conclusion of Law. The cases which give preference in the distribution of the assets of an insolvent building association to a member whose withdrawal notice has matured before the association stopped business do so upon the ground that the by-laws of such association clearly provide for such preference, and that under such by-laws the effect of a matured withdrawal notice is to terminate the membership of the member who gives it, and to convert him into a quasi creditor as against the other members who have not given such notice. Walton v. Edge, 10 App. Cas. 33. The language of the first paragraph of section 1 of article 7 of the by-laws of the defendant association, as amended in May, 1899, expressly declares that a withdrawal notice does not 'constitute a withdrawal or terminate the membership, or give to the person filing such notice the status of a creditor, or create any rights of action, legal or equitable, against the association, or in any manner alter or disturb his rights and duties as a member.' This by-law was evidently drawn by some one entirely familiar with the cases in which the right of a withdrawing member to preferential payment has been discussed by the courts. Its language is aptly phrased to negative every assumption upon which such preference has been based when such preference has been upheld at all.

"Second Conclusion of Law. That if the amendments made to the by-laws of the defendant corporation in May, 1899, are not binding upon the petitioners, their withdrawal notices had not matured at the time of the appointment of a receiver in this cause.

"Reasons for the Second Conclusion of Law. By the express terms of the certificates of paid-up stock held by the petitioners, they were redeemable,—that is, withdrawable,—subject to the provisions of the by-laws of the association, 'thirty days' notice of intention to redeem being necessary.' The requirement that a stockholder desiring to withdraw his or her stock shall give thirty days' notice of his or her intention so to do is found in section 2 of article 6 of the by-laws of 1891. It appears that only five days elapsed between the filing of the notice of withdrawal of one of the petitioners and the appointment of the receiver in this cause, and only twenty-one days between the filing of the notice of the other petitioner and the appointment of such receiver. It is obvious that, if the by-laws of 1899 are not binding upon the petitioners, their rights as against the association are governed by the by-laws in force when they became members, and by the terms of their certificates of stock, and that thirty days' notice was required from them of their intention to withdraw before their withdrawal notices matured.

"Third Conclusion of Law. That the court of last resort of the state of Maryland has never decided whether or not a stockholder of an insolvent building association, who has given notice of withdrawal of his stock

110 F.—18

before the declaration of insolvency, is entitled, when the association is being wound up by a court of equity, to a preference in the distribution of the corporate assets over those stockholders who have not given such notice.

"Reasons for the Third Conclusion of Law. The counsel for the petitioners in the argument before the special master strenuously argued that the court of appeals of Maryland had decided that under the circumstances mentioned in the third conclusion of law, and existing in this cause, stockholders who had given such notice of withdrawal before the declaration of insolvency were entitled to priority of payment over those stockholders who had not given such notice. They relied upon the following cases: Gaehle's Piano Mfg. Co. v. Berg, 45 Md. 113; Hennighausen v. Tischer, 50 Md. 583; Association v. Price, 88 Md. 155, 41 Atl. 53, 42 L. R. A. 206; Baltimore & O. Relief Ass'n Cases, 77 Md. 566, 26 Atl. 1045; Failey v. Fee, 83 Md. 83, 34 Atl. 839, 32 L. R. A. 311. A careful examination of each of these cases shows that the precise question was not necessarily involved in any of them, and was not decided. In the case of Gaehle's Piano Mfg. Co. v. Berg, 45 Md. 113, the association was still a going concern. It was sued at law by a stockholder who had exercised the right given him by its charter and by-laws to withdraw his stock. The court of appeals held that the by-laws said that a withdrawing member had the right to withdraw, and to receive what he had paid for his stock, without any abatement for the losses incurred by the corporation. It further held that this by-law was valid and binding upon the corporation, and that therefore the stockholder was entitled to be repaid what he had paid in on his stock; and this, too, although the corporation, before he had given notice of withdrawal, had suffered losses. The other stockholders were still carrying on the business of the corporation. All that the decision of the court of appeals in this case amounted to was that if the stockholders chose to guaranty by their by-laws to any of their number the right to withdraw and take out all he had paid in, whether the corporation had suffered losses or not, they were bound, so long as they continued to operate the corporation, to carry out the agreement they had made. In the case of Hennighausen v. Tischer, 50 Md. 583, the corporation was a building association, strictly, as the Gaehle Manufacturing Company was not. It was being wound up by a court of equity. The appellee in the case was a member of the association who had borrowed money from it, and who had given a mortgage to it. He had also bought the unredeemed shares of certain members who had given notices of withdrawal. He claimed the right to credit against his mortgage indebtedness the amount which should have been paid on these unredeemed shares, according to the by-laws, at the time the notices of their withdrawal matured. The receivers denied his right to such credit, and said he ought to file his claim as a holder of these unredeemed or free shares with the other stockholders or creditors. The court said: 'The withdrawing members had given written notice of their withdrawal, and the secretary had entered on their books the sums they were entitled to withdraw. As shareholder, a member is liable for his proportion of losses, but as creditor he is entitled to recover the amount due him, independent of all losses. The balances assigned him by withdrawing members must be presumed to have been ascertained after allowing all deductions to which the withdrawing members, the assignors, were then subject or liable.' All that is necessarily decided by the court in this case was that the withdrawing member could not be charged with losses incurred after he had ceased to be a member, and that the amount due him after deducting all losses to which he was liable had been definitely ascertained, and that, having been so ascertained, such ascertainment was binding on the other members. If the amount he was entitled to receive had been so ascertained, and such ascertainment was conclusive upon the other members, it obviously would have been unnecessary and contrary to the established principles of courts of equity to have driven him to a new proceeding, or to have compelled him to wait to a subsequent stage of the pending proceeding to get this already definitely fixed and ascertained credit upon the claims of the association against him. The court therefore held that he was entitled to a credit as against his mortgage for the amount of the sums entered on the books by the secretary as the withdrawal value of the shares so assigned to him.

The question whether the determination by the secretary would have been binding upon the corporation and the other stockholders, had it been a mistaken one when made, was not presented in the case, and was not passed upon by the court, which, indeed, had no data upon the subject before it. The court said: 'There is no sufficient evidence of insolvency of the corporation in this case. The proceedings under which the receivers were appointed are not made a part of the record. Non constat that the assets of the West Saratoga Building Association are not sufficient to pay its debts.'

"The case principally relied upon by the petitioner was that of Association v. Price, 88 Md. 155, 41 Atl. 53, 42 L. R. A. 206. This was a suit at law. The Southern Building & Loan Association was a Tennessee corporation. The plaintiff, appellee above, was a holder of stock therein. The by-laws of the corporation provided that 'withdrawn stock will be paid for in the order in which notice is given, but the association shall not be required to use in the payment thereof in any one month, without the consent of the board of directors, more than one-half of the net receipts of the loan fund for that month.' The plaintiff on the 21st day of December, 1896, while the corporation was a going concern, gave such notice of withdrawal. On the 16th day of April receivers were appointed for the corporation by the courts of Tennessee. A few days thereafter the plaintiff sued out an attachment against the defendant corporation for the amount he had sought to withdraw from it. The defendant corporation appeared in the attachment proceedings and pleaded the above provisions of its by-laws, and averred facts showing that, under said by-laws, plaintiff was not entitled to present payment. The plaintiff in his replication confessed the truth of the facts alleged in the plea, but said that 'when the notice was given, received, and accepted, the plaintiff became a creditor of the association to the amount owing on the said withdrawn stock, under the charter and by-laws of the defendant, and subject to the charter and by-laws,' and that the provisions of the by-laws by which the plaintiff was limited to payment in order and out of one-half of the net receipts were made upon the condition that the defendant would continue its business according to its charter. The replication further alleged that the corporation had contracted with the plaintiff so to continue its business, but that on the 16th of April, 1897, being a Tennessee corporation, it was by a decree of the chancery court of that state placed in the hands of receivers, who took possession of its assets in Tennessee, and that the defendant ceased to do business in the manner provided by its charter and by its contract with the plaintiff, and ceased to have any receipts whatever applicable to the payment of withdrawn stock. The defendant demurred to this replication. The case went to the court of appeals on the demurrer, and the question involved was one of pleading, purely. The plaintiff by its replication had alleged that the defendant had contracted with him to continue to do business, and that the limitations on his right to demand present payment for his withdrawn stock were conditioned upon the performance of this contract by the defendant. The demurrer confessed the truth of these allegations. The court of appeals held the replication good, as on its face it clearly was. It is familiar law that, if a party to a contract itself renders impossible the performance of conditions intended for its protection, it cannot, as against the other party, rely upon the nonperformance of those conditions. The case was one between the withdrawing stockholders and the corporation. The other stockholders were not parties. Moreover, from the statement of the court it would appear that the practical result reached was substantially the same it would have been had the corporation been wound up in equity, and its assets distributed among the stockholders without preference or priority. The court said that, in determining the amount of the verdict to which the plaintiff was entitled, the losses suffered by the corporation had been taken into account. If in point of fact these losses were so taken into account, the principle for which the defendant corporation and its receivers are contending in this case was applied. There is no question, of course, that the withdrawing stockholders will, when the assets of the corporation are ready for distribution, be entitled to receive what they have paid into it, less their share of its losses. The case of Association

v. Price is therefore not in any sense an authority for the contention that the withdrawing stockholders are entitled to payment in full, without regard to what losses the association has suffered. In the subsequent case of Cook v. Association, 90 Md. 284, 44 Atl. 1022, the court of appeals expressly declared that the case of Association v. Price, as presented to it, was one of the exercise of the right of withdrawal, unaffected by the question of insolvency with which the Maryland court had nothing to do, the Tennessee decree having no extraterritorial effect. In the opinion in the Cook Case, supra, the court of appeals refers, and apparently with approval, to a number of the cases in other states which upheld the rule for which the defendant building association and its receivers in this matter are contending. It is not necessary, however, to draw any inference from such citations. It is true, as the counsel for the petitioner says, that the question of the relative rights of the withdrawing and nonwithdrawing stockholders was not before the court, and was not passed on by it. It is equally true that no such question was before the court in the earlier case of Association v. Price. The declaration of the court of appeals in the Emmet Building Ass'n Case shows that that tribunal understood the effect of the Price Case as that case has been above explained. The case of Failey v. Fee, 83 Md. 83, 34 Atl. 839, 32 L. R. A. 311, concerned the winding up of the insolvent Order of the Iron Hall. The Order of the Iron Hall agreed with the persons who became its members that, if they would pay certain assessments for a period of seven years, the order would at the end of that period pay to them the sum of $1,000. The court of appeals held that those persons who had before the appointment of the receivers actually completed their seven years of payment became entitled to receive the sum of $1,000 each, and were entitled to be paid that sum before any dividend out of the assets could be paid to those members who had not yet completed their payments. The case was decided very largely upon the authority of Baltimore & O. R. Co. v. Employés' Relief Ass'n, 77 Md. 566, 26 Atl. 1045, to be presently discussed. The agreement among the members of the Iron Hall was substantially that those who had begun their payments first should first be paid in full, and that those who began their payments later should take their chances. If the scheme was valid at all, there was no reason why the rule of first pay first paid, laid down by the members themselves, should not be followed by the courts. In the case of Baltimore & O. R. Co. v. Employés' Relief Ass'n, 77 Md. 566, 26 Atl. 1045, a mutual life and accident insurance association was being wound up in a court of equity. It was there determined that claims for indemnity for death and accident which had matured by the happening of the death or the accident before the winding up of the association began were entitled to a preference over the claims which had not then matured. It seems to have been conceded in this case that the claims for indemnity for deaths which happened before the winding up were preferred. The dispute was as to the right of the members whose claims were for weekly payments for an indefinite period as an indemnity for injuries suffered by them before the winding up began to stand in the same category with the holders of matured death claims. The court held that they so stood. The case, however, is a recognition in the state of Maryland of the doctrine laid down in Mayer v. Attorney General, 32 N. J. Eq. 815, and which has since been generally followed in this country, viz. that, in a mutual life insurance association or order, claims for indemnity which had matured before the winding up are entitled to be paid in full before any payments can be made to those members whose claims have not matured at that time. The rule is different in the case of insurance companies not mutual. The distinction is based upon the fact that in a mutual company all the insured are partners, but that by the terms of the association, and of the contracts between it and its members, that partnership terminates upon the maturity of the certificate or policy. When such membership terminates, the person whose membership has so terminated ceases to be a partner in the concern, and becomes, as against those who continue in the business, although not necessarily against outside creditors, a creditor, and as such entitled to payment in preference to any distribution

among those who still remain partners. There can be no question that substantially the same reason was given by Earl Selborne and Lord Blackburn for holding that members of insolvent building associations whose notices of withdrawal had matured before the association had stopped business were entitled to preferential payment out of the assets. Walton v. Edge, 10 App. Cas. 33. It is important to observe, however, that there is one great practical difference between a building association whose members give notices of withdrawal, and an insurance association furnishing indemnity against death, injury, or other casualty. The event upon which the maturity of the indemnity certificate or policy of the insurance association depends is one which happens independent of the action or volition of the beneficiary. The withdrawal notice given by a member of a building association is his voluntary act. In the former case there can be nothing akin to a race of diligence among the policy holders. In the latter case there can be, and usually is. In the particular cases of the petitioners now under consideration, it is admitted that they did not know that the association was insolvent, and that they did not believe it was, when they gave their withdrawal notices. It is obvious, however, that, as a general rule, when a building association is moving towards insolvency its withdrawal notices will increase in number, and that while it will usually be impossible to show that those giving them had any definite knowledge that the association was insolvent, or even to show that they believed it was, it will still remain likely that, as a rule, those notices will be given by those people who have, or whose friends have, the best means of obtaining accurate knowledge as to what the situation of the association is. A rule of preference which favors persons so situated at the expense of the others is not one which will commend itself to a court of equity. It must be admitted, however, that the rule laid down in Baltimore & O. R. Co. v. Employés' Relief Ass'n is based upon a doctrine which is susceptible of a logical extension to the case of building associations, however great the practical difference in the consequences which follow from the application of that doctrine may be. The court of appeals of Maryland, however, in the two subsequent cases of Association v. Price and Association v. Cook, has not itself recognized the case of Baltimore & O. R. Co. v. Employés' Relief Ass'n as an authority controlling the action of the courts of Maryland in the distribution of the assets of insolvent building associations. The courts of the United States are not, for the sake of following the Maryland court, bound to do what the latter court has not seen fit to do.

"Fourth Conclusion of Law. That the petitioners are not entitled, because of their having given the notices of withdrawal which they did give, to any preference or priority in payment over the other full-paid stockholders of the defendant corporation who had not, before the appointment of the receiver in this case, given any notice of withdrawal.

"Reasons for the Fourth Conclusion of Law. There is a direct and irreconcilable conflict among the authorities as to the right of a member whose notice of withdrawal had matured at the time an insolvent association stopped business to be preferred over the other stockholders. It is believed, however, to be well settled that those members whose notices have not matured at the time of such stoppage of business stand on no different footing from those members who have not given any notice at all. It is the English cases which upheld the doctrine of the preference of the member whose notice had matured. Those cases are, however, quite as clear to the effect that one whose notice has not matured is entitled to no preference whatever. Thus in one case the by-laws required six months' notice of withdrawal. The notice was given on October 8, 1886. The association stopped business February 14, 1887, something over four months later. The member who gave it was entitled to no preference. In re Sunderland, 36th Universal Bldg. Soc. (1890) 24 Q. B. Div. 394; In re Ambition Investment Bldg. Soc. [1896] 1 Ch. 89. It has already been shown that the withdrawal notices of the petitioners in this case had not matured at the time the receiver was appointed.

"Fifth Conclusion of Law. That the petitioners, even if it were held that their notices of withdrawal had, under the by-laws, matured before the ap-

pointment of a receiver in this cause, are not, because of their having given such notices, and of the maturity of such notices, entitled to be paid in preference to the other stockholders who had given no notice of withdrawal.

"Reasons for the Fifth Conclusion of Law. It has already been shown that the question has not been decided in Maryland. I have been referred to no case in which it has been passed upon by a federal court, and my own research has not discovered any such case. It is useless to attempt to reconcile the cases elsewhere. It cannot be done. The conflict among them is direct. The court is therefore at liberty to adopt that rule which seems to it to be most nearly in accord with the principles of equity and the proper construction of the contracts between the parties. In England the authoritative case is that of Walton v. Edge, 10 App. Cas. 33, where the question was fully considered by the house of lords. Earl Selborne and Lord Blackburn, who delivered opinions, held that the whole question was one of the construction of the rules or by-laws. If by the by-laws the member upon expiration of his notice of withdrawal is entitled, if the association was a going concern, to be paid as soon as the funds permit, his right at the expiration of his notice becomes fixed, and is a right to be paid so soon as the funds suffice, after paying all claims upon them prior to his. Nothing that can subsequently occur, whether it be insolvency of the association or what not, can change his rights, or put any one ahead of him or upon an equality with him who was not ahead of him or who was not upon an equality with him when his notice matured. It follows that the English rule holds that members who have given notices of withdrawal have among themselves the right of preference in the order in which their notices of withdrawal mature. According to the English rule, assuming, for the sake of argument, that the notices given by these petitioners had matured at the time of the appointment of the receiver, they would still be postponed to the payment of all the other stockholders whose notices of withdrawal had matured prior to theirs. In re Middlesborough, Redear, Saltburn-by-the-Sea, and Cleveland District Permanent Benefit Bldg. Soc., No. 2, 53 Law T. (N. S.) 203. Such is the English rule, and such, very briefly, is the reasoning upon which it rests. If it shall be adopted as the law by this court, the members who have given notices of withdrawal, and whose notices of withdrawal had matured at the time of the appointment of the receiver, would be entitled, after the payment of all the claims of outside creditors, to be paid in the order in which their notices matured, being preferred in that order to each other and to other stockholders otherwise in like case with them, but who had either given no notices of withdrawal, or whose notices of withdrawal, if given, had not matured at the time of the appointment of the receiver. The great weight of American authority holds the contrary doctrine, viz. that a member of a building society who has not been paid the withdrawal value of his stock loses all right to a preference in payment when assets of an insolvent association are taken in charge by a court of equity for distribution among those having claims on them, and this in spite of the fact that his notice of withdrawal had matured before the winding up of the association had begun, and in spite of the fact that at the time he gave his notice of withdrawal and at the time it matured he had no knowledge or belief that the association was insolvent. The leading case on the subject is that which is usually known as Christian's Appeal, 102 Pa. 184. In this case, under by-laws which it would be difficult to distinguish in any important respect from those in force when the petitioners became stockholders of the defendant corporation, certain stockholders had given notices of withdrawal. Those notices had matured, and they had received orders on the treasurer for the payment of the withdrawal value of their stock. These orders had been given more than six months before the association made its assignment. The court held that the provisions in the by-laws of such associations providing for withdrawals implied that at the time such members received the withdrawal value of their stock there is left a reasonable proportion of the assets of the association for the other members, and when this is not so, as it is not when the association has become insolvent, they have lost all their right to a preference. And accordingly it was held that the stockholders who had given their withdrawal

notices, and whose withdrawal notices had matured, and who had received orders from the treasurer for the payment of the withdrawal value of their stock, were not preferred to other stockholders.  It was said that had the association suffered losses, resulting from bad investments made after they withdrew from the association as active members, they would not be required to stand any share of such losses, but in that case, as in that of the petitioners in this case, the evidence did not show that any such losses after withdrawal had in fact occurred.  The same conclusion was reached by the court of appeals of Kentucky in Reddick v. Association, 49 S. W. 1075. There the court said that, looking beyond the mere language of the by-laws and statutes, it is manifest that these withdrawal contracts are provided for with respect to going concerns only.  Forwood v. Eubank (Ky.) 50 S. W. 255.  The supreme court of Missouri, in the case of Hohenshell v. Association, 140 Mo. 566, 41 S. W. 948, followed and approved the decision in Christian's Appeal, and held distinctly that, if the association was insolvent at the time the notice of withdrawal was given and accepted, the stockholder giving such notice had, on the subsequent winding up of the association by a court of equity, no preference over those stockholders who had not given any such notice.  To the same effect is the decision of the supreme court of Illinois in the case of Gibson v. Association, 48 N. E. 580, which approves the earlier case in the appellate court of Illinois of Chapman v. Young, 65 Ill. App. 131.  The same doctrine has been upheld by the supreme court of Iowa in the case of Rabbitt v. Wilcoxen, 103 Iowa, 35, 72 N. W. 306, 38 L. R. A. 183.  Substantially the same doctrine was applied in the case of Post v. Association, 97 Tenn. 418, 37 S. W. 216, 34 L. R. A. 201.  There the stock of one of the members had been declared matured. He was entitled to receive its par value.  He did not actually draw it, and the association afterwards went into the hands of receivers, and it appeared that at the time his stock was declared matured, in point of fact, had he been charged with his proper share of losses, it would not have been matured.  It was held that he was entitled to no preference.  End. Bldg. Ass'ns (2d Ed.) § 514, says:  'The truth is that there is implied in the very essence of the building association scheme an agreement between the members of every association, in the light of which all other agreements and rules and by-laws must be read, and to which they must be conformed, and that is the agreement that all burdens shall be equally borne, as all profits equally shared; that the whole enterprise shall be concluded, and the rights and obligations of the participants in it shall be adjusted upon a basis of strict mutuality, equality, and fairness. * * * There is nothing in the mere fact that one has given a certain number of days' notice that he wants his money whereby he is, ipso facto, invested with an equity to receive it prior to that of one who has not given such notice. There is therefore nothing to counterbalance, much less to outweigh, the inequitableness of permitting him to take the fund belonging to his fellows in order to pay himself. * * * In short, the order prescribed by the by-laws of a building association for the payment of money out of its treasury to the different classes of holders of ordinary stock in the regular course of its business does not apply to the distribution of its assets when insolvent.'  The other recent text-books—that is to say, Thomp. Bldg. Ass'ns (2d Ed.) § 148, and Thornt. & Bl. Bldg. & Loan Ass'ns (2d Ed.) § 329—do little more than state the different decisions without apparently recognizing their hopeless conflict.  No American cases have been cited to me in which the precise question involved in this appeal was expressly decided in conformity with the English rule.  In the case of Moore v. Association, 50 S. C. 89, 27 S. E. 543, the supreme court of South Carolina held that a member who had given notice of withdrawal could maintain an attachment against the assets of an insolvent building association.  The case was very similar to that of Association v. Price, 88 Md. 155, 41 Atl. 53, 42 L. R. A. 206, and, as in that case, was very possibly decided rightly upon the pleadings as they stood.  The defense made by the association in the South Carolina case was the purely technical one that a member of the association could not sue the association at law, being a partner in it.  To this technical defense the technical answer that the withdrawal terminated

the membership and converted him from a debtor to a creditor was held a sufficient reply. A very similar ruling was made in the case of Association v. Silverman, 85 Pa. 394. But Silverman's Case, if construed to support the English doctrine in the case of an insolvent building association, was expressly overruled in the subsequent case of Christian's Appeal, 102 Pa. 184, already cited.

"After all the reasoning of the English and American courts is boiled down, it comes very much to this: The American courts say that it is clear that the provisions of the by-laws were not intended to apply to insolvent associations. The provisions of the by-laws governing withdrawals, like many of the provisions of the by-laws with reference to borrowing members, are obviously intended and are equitably applicable only so long as the association is a going concern, from which all the members may ultimately hope and expect to receive approximately equal benefits. The English courts say that the by-laws do not provide that members whose notices of withdrawal have matured before the association has ceased doing business shall upon its subsequent ceasing to do business be deprived of the right to be paid in full. If the members had wanted to provide for such a contingency, they could have done so. If they had not done so, the courts will enforce their agreements as they find them. One argument is, perhaps, as strong as the other. The real question to be considered, therefore, by this court, is which rule would practically be the most equitable, and the least liable to abuse. Members who have given notice of withdrawal are distinguished from the other members of the association merely by that fact. They are entitled to no extra privileges, because they are exposed to no extra burdens over those of all their fellow stockholders. They have given their notice of withdrawal. If they actually get their money before the association goes into the hands of the courts, they are, in the absence of fraud, entitled to maintain the advantage they have thus gained. It is admitted that when the association goes into the hands of a receiver the right to give further notices of withdrawal ceases. Why should not the right cease as well to be paid on notices of withdrawal already given? Equality is equity. There is no reason in the nature of things why one stockholder who has not gotten his money out of the association should get any larger share of his money from the association than any other stockholder, unless there was some specific contract or some special equity in his case that gives him the preference. Nor will a court of equity be ready to construe doubtful provisions of the by-laws into a specific contract giving one shareholder such an inequitable preference over his fellows. Nor can courts of equity ignore the practical consideration that if the rule be laid down that members whose notices of withdrawal have matured before the winding up of the association begins shall be preferred over other stockholders, in the long run, and in nine associations out of ten, the practical effect will be that those persons who have the best means of knowing what the condition of the association is (that is to say, the officers and employés of the association, and their friends) will, in the distribution of its assets, be preferred to the great body of the stockholders, and especially to those who are poor and ignorant, and who will not have given notices of withdrawal. Nor can the courts, if they apply the English doctrine, escape from the practical consequence of it by laying down the rule that such notice shall not create preference if the person who gave it, at the time he gave it, had reason to believe that the association was insolvent. An inquiry as to whether a member giving such notice knew of the insolvency would always be troublesome, would from the nature of the issue to be determined give rise to a state of feeling calculated to impede the cheap and speedy winding up of the association, and would usually be unproductive of any clear and certain result. The safe and equitable rule, as it seems to me, is that which has in the last few years received rapid and almost general recognition from the American courts, and that is that if a member gives a notice of withdrawal which matures when the association is actually insolvent, although its insolvency may not be known or suspected by the person giving such notice, and before the member giving the notice is paid the withdrawal value of his stock, the association ceases to do business

and is wound up in equity as an insolvent corporation, such member has no priority over other stockholders."

Joseph B. Seth, for intervening petitioners.

Russell & Winslow, Richard S. Culbreth, Morton Schaeffer, Fielder C. Slingluff, and Randolph Barton, for defendant association and its receivers.

MORRIS, District Judge. I concur in the reasoning and conclusions of the special master as set forth in his very learned and carefully prepared report. I overrule the exceptions and confirm the report, and will sign an order denying the claim of the intervening petitioners to be paid in preference to other stockholders who had given no withdrawal notice.