## ROGERS v. OGDEN BLDG. & SAV. ASS'N.
## DRIVER v. SAME (CROSSMAN et al. Interveners).

No. 1637.   Decided December 2, 1905   (83 Pac. 754.)

1. APPEAL—REVIEW—ESTOPPEL TO ALLEGE ERROR.—Parties who admit a fact in their pleadings cannot question such fact on appeal.

2. BUILDING AND LOAN ASSOCIATIONS—RELATION TO MEMBERS—HOLDERS OF MATURED STOCK.—Where a building and loan association issued its stock in separate and consecutive series, agreeing with the stockholders to purchase the stock of each series as it matured, and in pursuance of its agreement and of the uniform custom and course of dealing between it and its stockholders, which was to pay off matured stock of one series in preference to matured stock of a subsequent series, purchased the stock of a certain stockholder on its maturity, and began paying therefor in installments and continued such payments for several years, with the knowledge and acquiescence of purchasers, and holders of subsequent issues of stock the holder of the matured stock would be regarded as a creditor of

----

[1] Godbe v. Young, 1 Utah 55.

. the association to the extent of the payments due him on his stock or at least as having equities superior to those of the subsequent purchasers and holders of stock.

3. SAME—EVIDENCE—PRESUMPTIONS—SOLVENCY. —Solvency will be presumed, in the absence of evidence of insolvency.

4. SAME—WHAT CONSTITUTES INSOLVENCY.—Insolvency denotes the insufficiency of the entire property and assets of an individual to pay his debts, and is to be determined from a comparison of all assets and resources with his liabilities, and not alone from the amount of money on hand or coming in, or from the absence of money on hand.

5. SAME—SALES OF STOCK—EVIDENCE—POSSESSION OF SELLER. — Where a holder of matured stock in a building and loan association agreed to surrender the same and sell it to the association, and in pursuance of such agreement the association began to pay him therefor in installments, his continued retention of possession of the stock, while evidentiary of ownership in him, was not conclusive, and, in view of the fact that the stock was being paid for in installments by the association, was not inconsistent with the existence of a consummated sale to the association.

6. SAME—INTEREST—WHEN ALLOWED.—A stockholder in a building and loan association, who, on the maturity of his stock, sold it to the association according to agreement in the usual course of business of the association, was entitled, on the failure of the association to pay for the stock, to recover, not only the amount of his claim at the time it was due, but interest thereon from that time.[1]

McCARTY, J., dissenting.

APPEAL from District Court, Weber County; Chas. H. Hart, Judge.

Actions by L. R. Rogers and by Jesse J. Driver against the Ogden Building & Savings Association. In the latter action W. W. Crossman and L. R. Rogers intervened, after which the actions were consolidated and tried together. From a judgment rendered in favor of Rogers, Driver and Crossman appealed.

AFFIRMED.

A. G. Horn for appellants.

John A. Street for respondent.

---

1 Godbe v. Young, 1 Utah 55.

## APPELLANT'S POINTS.

A corporation, such as the one at bar, the holder of matured or paid up stock, cannot maintain an action at law against the association to recover the value of his stock. This doctrine is elementary. (Endl. on Bldg. Ass'n, par. 118; Thornton on Bldg. Ass'n, sec. 330; *O'Rourke v. B. A.,* 8 W. N. Cases 176, 93 Pa. St. 308; Thompson on B. A., par. 107; *Chrisswell's Appeal,* 100 Pa. St. 488.

We contend that in cases where a building association is insolvent and there exists no agreement or statute by which one stockholder shall be preferred in the payment of his stock as against another stockholder, that the rule of law is in the absence of creditors, that they shall pro rata their claims and that no one is entitled to a preference in the payment of his claims as against the other. (*Crisswell's App.,* 100 Pa. St. 488; *Gibson v. Loan Co.,* 170 Ill. 44, 39 L. R. A. 202; *Ass'n v. Stolz,* 93 Ill. App. 164; *Hohenshell v. Ass'n,* 140 Mo. 506, 41 S. W. 948; *Leahy v. Ass'n,* 100 Wis. 555, 76 N. W. 625; *Towle v. B. A.,* 75 Fed. 938; *Coltrane v. B. A.,* 110 Fed. 272; *Rabbitt v. Wilcoxen,* 103 Iowa 35, 72 N. W. 306; *Price v. Kendall* [Tex.], 36 S. W. 810; *Post v. Loan Co.* [Tenn.], 37 S. W. 216, 6 Cyc. 165-6.)

It will also be contended that unmatured stock was a fund in equity to pay off respondent's claim and the unpaid part should be so applied. In reply we claim that the appointment of a receiver terminates all stock payments. (6 Cyc. 164. *Leah v. B. A.,* 76 N. W. 625.)

In speaking of preferential agreements the court says, "All such attempts are absolutely void as contrary to the natural law of such associations." (*King v. Co.,* 170 Ill. 135; *Trowbridge v. Hamilton,* 18 Wash. 686; *Wierman v. Loan Co.,* 67 Ill. App. 550; *Latimer v. Loan Co.,* 81 Fed. 776; *Summeral v. Trust Co.* [Ky.], 44 L. R. A. 659.)

## RESPONDENT'S POINTS.

When Mr. Roger's stock was declared "matured" and payable and he accepted the declaration of the corporation to that

effect, he at once became affected with a different relation than any other person not in like position. The term "matured" is equivalent "to be suable." (20 Am. & Eng. Ency. of Law [2 Ed.], page 236, note; *United States v. Union Pacific R. Co., 91* U. S. 85.) "A creditor is one who has a right to require the fulfillment of an obligation or contract." Bouvier's Law Dictionary. Quite in point upon the contention that Mr. Rogers is a creditor is the case of *Blalock v. Kernersville Mfg. Co.,* 110 N. C. 99, 14 S. E. 501, (3 Cook on Corporations [4 Ed.], sec. 863, and cases cited; *W. P. Noble Mer. Co. v. Mt. Pleasant Co-op.,* 12 Utah 213.)

"When a party with full knowledge or at least with sufficient notice or means of knowledge of his rights and of all material facts freely does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation or lies by and for a considerable length of time and knowingly permits the other party to deal with the subject-matter under the belief that the transaction has been recognized, or freely abstains for a considerable length of time from impeaching it so that the other party is thereby reasonably induced to suppose that it is recognized, there is acquiescence and the transaction although originally impeachable, becomes unimpeachable in equity." (*Raht v. Sevier M. & M. Co.,* 18 Utah 303 and cases cited; 2 Pomeroy's Eq. Juris., sec. 965 [citing many cases]; *Sheldon Hat B. Co. v. Eickemeyer H. B. M. Co.,* 90 N. Y. 616.)

On appeal only such parts of the judgment or decree of the subordinate court as are appealed from can be reviewed. (*Kelsey v. Western,* 2 N. Y. 500-505; *Matter of Davis,* 149 N. Y. 548.)

It is inability to meet the debts due its creditors which constitutes the insolvency of the general corporation. (*Hagenbeck v. Hagenbeck Z. A. Co.,* 59 Fed. 14; *Hazelton v. Allen,* 85 Mass. (3 Allen) 114; *Ridge v. Turnpike Co.,* 4 Pa. St. 490; 16 Am. & Eng. Ency. Law (2 Ed.), p. 636, and cases cited.

STRAUP, J.

1. The Ogden Building & Savings Association was a corporation organized in 1893 under the general incorporation act of the then territory of Utah, and, while not technically known as a building and loan association, to some extent it partook of the nature of such associations. The purpose of this organization, as stated in its articles of incorporation, was "the accumulation of a fund by the savings of the members thereof sufficient to enable each shareholder to invest his savings safely and speedily, and to purchase real estate, or to invest the same as may be deemed by him most profitable, and that each shareholder may have the benefit of the aggregate capital which co-operation produces, and loaning money to shareholders for the purpose of enabling them to erect buildings, and otherwise loaning and investing money, and the purchasing and holding real estate for the purposes and benefits of the association." It was also provided by its constitution and by-laws that "each and every shareholder, for each and every share of stock that he had subscribed for, paid the sum of fifty cents subscription fee, and the sum of one dollar each and every month thereafter, until the value of the stock in which the series to which the subscription was made became sufficient to divide to each share of the said stock the sum of one hundred dollars." It was also shown that the association had separate, distinct, and consecutive series of stock numbered from 1 to 37. Subscribers purchased of said corporation shares of its capital stock, paying therefor in monthly installments until the amount paid, as aforesaid, together with the natural earnings of said association, equaled the sum of $100 or more per share, when, as is conceded by all parties, and as is alleged in their pleadings by the appellants, "the said shares of stock should be fully matured, and the association agreed to and with such stockholders to then and there pay them in lawful money of the United States the amount at which said shares of stock had matured." About the year 1890 respondent Rogers took out and was the holder of thirty-five shares of what is known as the "Fifteenth Series" of said capital stock, and from thence on continuously

made monthly payments thereon until the 30th day of September, 1898, when said stock was fully paid and matured. All previous series having been therefore matured and paid for by the association and retired, the association, on the day last aforesaid, by resolution of its board of directors in a regular meeting, declared the said thirty-five shares of stock matured and then and there payable to the said Rogers at $102 per share, amounting in the aggregate to $3,570. Thereafter the association made partial payments thereon, leaving on June 26, 1903, a balance due and unpaid of about $2,700. Upon repeated demands made by respondent Rogers for his money, and upon failure of the association to pay it, on October 3, 1903, he commenced his suit against said association for the collection of the same. The defendant association appeared and demurred to the complaint, and, its demurrer being overruled, on November 19, 1903, it answered. In the meantime, and on the 2d day of November, 1903, the appellant Driver commenced an action against the defendant association, alleging its insolvency, and asked for the appointment of a receiver. On the same day the defendant association, through appellant Crossman, its president, filed an answer admitting all the allegations of Driver's said complaint, appeared in court, and consented to the appointment of a receiver, and on said day last named one Kelly was appointed receiver for said association. On November 9, 1903, respondent Rogers was given leave to file a complaint in intervention in said suit, which was done by him. Later appellant Crossman, who was a stockholder in a series subsequent to the fifteenth, for himself, and on assigned claims to him of stockholders also in series subsequent to the fifteenth, except one Tracey, who was of the fifteenth series, also filed a complaint in intervention in the said action. The actions were consolidated and brought on for trial before the court. It appears from the record that, in the filing of the various pleadings in said causes, the defendant association, the plaintiff Driver praying for the appointment of a receiver, the intervener Crossman, and the receiver himself were all represented by

one and the same counsel. The principal contest at the trial
was as to whether respondent Rogers was a creditor or mere
stockholder of the association, and as to whether; by reason of
the premises, his claim should be preferred, and therefore
should be paid out of the assets of the association before pay-
ing members in series subsequent to the 'fifteenth. There
were no so-called general or outside creditors. The constitu-
tion and the by-laws of the association were put in evidence,
and evidence was also given with respect to its series of stock,
and as to the manner in which prior series were treated and
preferred by the association and its members over subsequent
series.

Among other things the court found as follows:

"(3) The court further finds that from the inception of
the business of said defendant association its uniform, exclus-
ive, and continuous course of business and rule of corporate
action, to which all of its shareholders have at all times as-
sented, and under which they have subscribed for their stock
in the corporation, was that it divided its subscription to its
stock every six months into separate, distinct, and consecutive
series, subscriptions being continuously solicited, and the sub-
scribers in each semiannual period in which sufficient shares
were subscribed being classed together as shareholders of a
'series' numbered from 1 upward to 37, commencing with the
earliest subscriptions, and the subscribers to each separate
series being treated alike in respect to the maturity and pay-
ment of their shares in said series, and separate from all other
series; that up to the time the fifteenth series matured, as
hereinafter found, the stockholders in each successive series
of the fourteenth previous series of stock, at the time the said
stock in any such series became of $100 or more in value per
share by reason of the payments and profit, if any, theretofore
made upon such stock, were treated by the association as sel-
lers of their stock to the association, and as being creditors of
the association who were entitled to have the matured value of
their shares paid to them in money or by credit upon loans
made by the association to any of the borrowing stockholders
in such matured series; that the association paid off each suc-

cessive matured series in preference to any claims of its members in the subsequent or junior series (except that stock, withdrawn in accordance with the constitution and by-laws, upon notice of withdrawal given prior to the maturity of any series, was paid in preference to stock of an earlier series maturing after such withdrawn stock became payable under the rules of said company) and that after payment in full, as far as the shares in the matured series were concerned, the holders ceased to be either stockholders or creditors, while all the stockholders in all the unmatured series carried on the business of the association, and that on a number of occasions the association borrowed money to pay off the mature price of stock in matured series."

"(7) The court further finds that from the inception of its business the said association held out to its shareholders that, when the stock in a series matured, the association would purchase the said stock at the matured prices, and that the debt or obligation to pay for said stock in such matured series would have a preferred lien and preferred right of payment in cash or by credit on loans of any claims whatsoever of the stock in any subsequent or junior series, except stock withdrawn prior to maturity of an earlier series, and that this was the basis upon which L. R. Rogers subscribed and paid for his stock, and it was the condition under which all the shareholders in the association, including all the persons represented in this suit, including assignors of W. W. Crossman intervenor, subscribed for and made payments upon their stock, and that after the maturity of the stock on the said L. R. Rogers and said S. H. Tracey in the fifteenth series, as hereinbefore found, the association, with the full knowledge of all its existing stockholders, first paid certain balances due upon the fourteenth series of stock as a preferred claim and lien, and then commenced, and continued for several years up to the 26th day of June, 1903, the making partial payments upon said matured stock of L. R. Rogers and said S. H. Tracey as claims having a preferred lien and preferred right of payment ahead of any claims of the remaining stockholders of said association, including all persons interested in this suit;

and the court further finds that each and all of the said re-
maining stockholders were, during the time that said pay-
ments were being made on said fifteenth series, officers and
directors of the said defendant association, and authorized
the said payments upon the matured stock of said fifteenth
series as preferred claims; that said association continuously
dealt with said L. R. Rogers, after maturing his said stock,
as a creditor having a perferred lien upon the assets of the
association, and a preferred right of payment for the amount
due him, and during the month of March, 1903, made a state-
ment to him as a creditor who was then pressing his claim for
payment, representing that the association was solvent and
had a surplus profit of over $3,700."

The court also found that on the 30th day of September,
1898, Rogers had paid upon said stock the sum of $102 per
share in cash, exclusive of any interest on payments, or any
profits of the association, of which none had been paid or al-
lowed or credited to said stock, and that on said day the as-
sociation, by resolution of its board of directors in regular
meeting, declared the said 35 shares of the said Rogers fully
matured and then and there payable to him at the sum of
$102 per share, amounting, in the aggregate, to the sum of
$3,570, and that the association thereafter made payments on
said stock from August, 1901, until June, 1903, at which
time the last payment was made, leaving a balance due Rogers
of about the sum of $2,700. The court also found that there
was due the assignor Tracey the sum of about $600, and that
he was also in said fifteenth series, and was similarly situated
to Rogers. The court also found the amount of moneys paid in
by members in the series subsequent to the fifteenth, who had
made assignments to appellant Crossman. The court also
found that the commencement of the suit by Driver seeking
the appointment of a receiver and all the proceedings had in
the action with respect thereto, were collusive and for the
purpose of preventing respondent Rogers from securing the
preference of payment claimed by him. As conclusions from
the findings, the court held that respondent Rogers and as-
signor, Tracey, were entitled to interest on their respective

claims from the time they became due and ought to have been paid, and that their claims were entitled to priority over claims of those in series subsequent to the fifteenth, and by the decree Rogers and Tracey were given priority accordingly. Crossman and Driver appeal and assign error as to portions of finding No. 7, and as to the court giving Rogers and Tracey interest on and priority of their claims.

2. It is not claimed that finding No. 3 is unsupported by the evidence, nor is any error assigned with respect to it, nor is it in any manner assailed. Error with respect to finding No. 7 is assigned because of a want of evidence to sustain that portion of the finding wherein it is found that the association agreed to purchase the stock at its maturity, and that the debt or obligation of a prior series was entitled to preference over a subsequent one. In regard to the agreement made by the association with its stockholders to purchase the stock at its maturity, we have but to look at the complaint in intervention of appellant Crossman, where he alleges as follows: "And one of its objects was to have its stockholders purchase of it shares of its capital stock, paying therefor monthly installments until the amount paid, together with the net earnings of the association, should equal the sum of $100 or more per share. Then the said shares of stock should be fully matured, and the association agreed to and with such stockholders to then and there pay them in lawful money of the United States the amount of which said shares of stock had matured." In the complaint of appellant Driver, after stating the general purpose and business of the association, it is alleged: "And that in that connection said defendant's business was to have the stockholders purchase of said defendant's shares of its capital stock, paying therefor in monthly installments until the amount paid, together with the net earnings of said association, should equal the sum of $100 each or more per share, when the said shares of stock should be fully matured, and the association agreed with such shareholders to then and there pay him in lawful money of the United States the amount at which said shares of stock had matured." Having thus admitted by their pleadings that there was such an agreement, appellants are not now in position to question

such fact. With respect to a preference of a prior series over a subsequent one, Kelly, who was secretary of the association from 1895 to the time of his appointment as receiver, and who was a witness for appellants, testified: "Since 1895 the earlier series of matured stock was paid in preference to the later series, and in the order in which they matured. We opened a new series every six months, which were unlimited in amount, to be subscribed for." Respondent Rogers testified: "Stock was treated separate as to its maturity. The stock in the series previous to the fifteenth were matured and paid off. I have no knowledge of any stockholder acting as such after his stock matured, unless he had stock in junior series. The later series of stock continued the business. During all the time I was director or president the company treated matured stockholders as creditors, and borrowed money to pay them off. This was done from the Utah Loan & Trust Company. Each series of stock was treated independently of the other. I paid in the amount that my stock matured at." We then have finding No. 3 confessed, because in no manner assailed; and wherein finding No. 7 is assailed, because of a want of evidence, it is fully supported by evidence. Upon these facts we think the court was warranted in his conclusions that respondent Rogers and Tracey were creditors, and were therefore entitled to be paid out of the assets of the defendant association before payment to those in subsequent series. Appellants have cited numerous cases holding that, in the absence of any provision in the constitution or the by-laws, giving one series or class of stock preference over others, mere holders of matured stock in a building and loan association are not creditors, but, in case of insolvency and winding up of the association, they can only share pro rata with the holders of unmatured stock, and that, where such association was insolvent when notices of withdrawal were given, the shareholders giving such notices were not creditors with claims entitled to be paid in full the amounts by them paid to the loan fund, before other stockholders were entitled to anything, but were on a parity with other stockholders. (*Rabbitt v. Wilcoxen*, 103 Iowa 35, 72 N. W. 306, 38 L. R. A. 183, 64 Am. St. Rep. 152; *Coltrane v. Baltimore, etc., Loan Ass'n*

(C. C.), 110 Fed. 272; *Towle v. American, etc., Loan Assn.*
[C. C.], 75 Fed. 938; *Hohenshell v. Savings Loan Ass'n,*
140 Mo. 566, 41 S. W. 948; *Leahy v. National etc., Loan
Ass'n,* 100 Wis. 555, 76 N. W. 625, 69 Am. St. Rep. 945;
*Gibson v. Safety, etc. Ass'n,* 170 Ill. 44, 48 N. E. 580, 39 L.
R. A. 202; *Criswell's Appeal,* 100 Pa. 488; *Christian's Appeal,* 102 Pa. 184; Endlich on Bldg. Ass'ns, section 514.)

These principles of law, as applied to the facts in those
cases, are all conceded. The findings of the court, however,
here discloses a state of facts essentially different from those
existing in the cited cases. Here it is found by the court that
there were separate, distinct, and consecutive series; that the
association agreed with its stockholders to purchase the stock
of each series as it matured; that it, in effect, purchased from
respondent Rogers, and he sold to it his stock in 1898, when
it matured, and, in recognition thereof, the association began
paying therefor, and for several years thereafter made payments thereon in preference to other matured stock of any
subsequent series; that it was the uniform custom of the association, and it was its course of dealing with its members,
that, as a series matured, it was paid off in preference to any
claim of members in junior or subsequent series; that from
its inception the association held out to its shareholders that,
when their stock in a series matured, the association would
not only buy the stock at its matured value, but, also that the
debt or obligation in such series would have a preferred right
of payment over all and any claims of stock in a junior or
subsequent one; and that upon this condition and understanding appellants and their assignors subscribed for stock of series subsequent to Rogers, and acquiesced in the association
paying him and others, having matured stock of prior series,
in preference to any claim of a subsequent one. Because of
all these matters and conditions, as found by the court and
more especially appearing in findings No. 3 and No. 7, we
think the court was authorized in drawing the conclusion that
the relation of respondent Rogers to the association, at the
maturity of his stock and the purchase thereof by it from him
in 1898, became and was that of a creditor, or at least gave

him equities superior to appellants. (*U. S. v. Union Pac. R. Co.*, 91 U. S. 85, 23 L. Ed. 224.)

Mr. Endlich in his work on Building Associations at section 514, speaking of dissolutions and effects of dissolutions, among other things, says:

"To permit one member, or one set of members, to be paid in full at the expense of others who get less, is not to carry out that scheme or agreement (mutuality, equality, and equal burdens) unless there is something which gives the former an equity superior to the latter, whereby they have a better and stronger claim upon the property of the association. Where one has subscribed to and paid up stock upon a distinct understanding that it is to be preferred over that of others who have paid less, there is such a superior equity."

Where, as here, each series of stock has been treated by the association and all its members as distinct and separate, the rights of members in a particular series, and their obligations to the association, or to members in other series, must be ascertained as of the date of the maturity of the stock of that series. (Thompson, Bldg. Ass'ns [2 Ed.] 742.) It is quite apparent to us that from the time when his stock matured, his claim liquidated in 1898, and then promised by the association to be paid, Rogers was no longer, in fact or in law, a stockholder of the association, and could not rightfully, as such, have any voice in the management or conduct of its affairs; neither as a stockhoder was he entitled to share in the profits of the association made thereafter no matter how great. All that he could exact was the payment of his claim, together with interest thereon from 1898. There is nothing in the constitution or by-laws of the association precluding it from making an agreement to purchase its stock from its members, and where such an agreement is made, and such a course of dealing transacted, with the assent of its stockholders, we see no reason why the stock cannot so be purchased by the association, if creditors are paid. (1 Cook on Corp. (.4 Ed.), sections 3 and 311, and cases; *Blalock v. Mfg. Co.*, 110 N. C. 99, 14 S. E. 501; *Schilling, etc., Co. v. Schneider*, 110 Mo. 83, 19 S. W: 67.) Such authority is not here questioned. The very business and pursuit of this association contem-

plates the purchase of its stock issued to its members at the maturity of the stock or upon notice of its withdrawal.

3. Furthermore, this case does not fall within the principles of the cited cases, for the reason that there is no finding by the court of insolvency of the association; nor do appellants at all complain because a finding thereon was not made, nor is any assignment made with respect thereto. It is, however, argued by appellants in their brief that the association was insolvent at all times since the year 1893. Upon a review of the evidence we are not satisfied that it so greatly preponderates in favor of a finding of insolvency as to preclude a contrary finding. In fact we are satisfied that the preponderance of the evidence is in favor of solvency. It will be presumed that the association was solvent until there is some evidence tending to show that it was insolvent. The only witness speaking on the subject, and who says that the association was insolvent, was the receiver, who at the time of his appointment was, and since 1895 had been, the secretary of the association. But the testimony of this witness was contradicted by the official reports and records of the association made by himself, especially as made and reported by him in March, 1903, wherein he asserted that the association was solvent. In that year in his official reports he stated that the resources of the association consisting of bills receivable, fixtures, cash in the treasury, and real estate, amounted to $9,162.72; and that the liabilities, consisting of the 15th, 19th, 21st, 26th, 28th, 29th, 32d, 33d, and 37th series (all others having either matured or been withdrawn, and paid), amounted to $5,426, leaving an undivided profit of $3,726.72. While it was shown that in 1893, owing to defalcations of some of its officers, the liabilities of the association exceeded its resources, yet in 1895, the association had retrieved itself, at which time its resources over its liabilities, and its undivided profits, were the sum of $3,834.61; in 1896, $2,415.18; in 1897, $3,384.42; in 1898 (when Rogers' stock matured), $1,817.64; in 1900, $3,878.96; in 1903, $3,878.96. What the conditions of the association were in 1901 and 1902 does

not appear. These reports were certified to, approved, and submitted by the president, secretary, and auditor of the association. When his attention was called to his official reports, the receiver attempted to reconcile his oral testimony therewith by the statement that the valuations of real estate, as reported by him and other officers of the association, were unreal and not true. It may be that the trier of the fact, having before him the appearance and demeanor of the witness, or some corroborating circumstance, may be persuaded that the truth of the fact is as was orally testified to by the witness on the stand, and not as appears from his official declarations and conduct covering a period of eight years; but as the record is made to appear to us, were we to weigh this testimony and determine the fact, we would be disposed to take the official declarations and conduct of the witness with respect to solvency of the association in preference to his testimony of insolvency on the stand at a time when purpose and motive may have prompted him to have the facts different from those disclosed by his official records and books. When we find the defendant association, the plaintiff Driver, asking the appointment of a receiver, the receiver himself, and the intervener Crossman, who as president represented the company, and also as assignee represented claimants in different and conflicting series of stock, all represented by one and the same counsel, and also find appellants testifying that upon a discussion of the matter they had concluded "that it would be better for the association if all the members clubbed together and try and stand off Rogers' suit," and the finding of the court that the application for a receiver and all the proceedings had with respect thereto were collusive to defeat the claim of respondent Rogers, we are not at all impressed with the equities of appellants, nor with the oral testimony of their witness. Appellant Crossman is in this position: He, as president of the association, in the suit brought by Driver against the association for the appointment of a receiver, filed an answer admitting all the allegations contained in the complaint, went into court and consented that Kelly be appointed receiver, and, upon such appointments being made, thereafter

filed a complaint in intervention in 'the same suit, and, among other things, alleged that the said action brought by Driver was not brought or maintained by him in good faith, and "is a fraud upon the jurisdiction of the court," and then comes to this court and complains because the trial court found that said action was not brought in good faith.

It is, however, said that the earnest and repeated demands of respondent Rogers on the association for the payment of his claim, its reply that it had not sufficient money on hand with which to, and for that reason could not, pay it, are of themselves sufficient evidence of the insolvent condition of the association. It must be borne in mind that the stock, as it matured, was not payable out of any special or particular fund, as was the fact in some of the cited cases; but here the agreement to pay was absolute and unconditional. The mere fact, therefore, that the association had not on hand money in its treasury is not at all determinative of its insolvent condition. Insolvency is not alone determined from the amount of money on hand or cash coming in, but from a comparison of assets and resources, including all kinds of property, real and personal, with liabilities. The term "insolvency" denotes the insufficiency of the entire property and assets of an individual to pay his debts. (16 A. & E. Enc. L., 637.) Here it was shown that when stock prior to the fifteenth series matured, and the association had no money on hand with which to pay it, it borrowed money for that purpose. In this instance, although the claim of Rogers became due and payable in the year 1898, and although he made repeated demands for payment, and the association often acknowledged its indebtedness to him and made repeated promises to pay him, nevertheless, so far as it appears from the record, no attempt was made to borrow money with which to pay it; nor was there any inability on the part of the association to obtain a loan at all shown. It is in effect argued that notwithstanding the agreement of the association to purchase the stock, and the liquidation of Rogers' claim in 1898, the association, as matter of fact, did not purchase the stock because Rogers did not indorse nor surrender it to the association, but retained pos-

session of it, and therefore he still remained and was a mere stockholder. While his retention and possession of the stock was evidentiary of ownership in him, yet it was not conclusive. Under the circumstances, his retention of the stock was not at all inconsistent with the fact of its sale to the association, for it was the most natural thing for him to retain it until it was paid for.

Rogers, however, in 1902 offered to surrender his stock to the association upon its executing to him a secured note for its indebtedness to him; but this the association declined to do, not because of any claim that said indebtedness was not due and owing to him, but because, as stated by it, "It would tie up the property and make a great detriment to the handling of the same when it came to selling it," and, further, because it "would make all efforts, consistent with the condition of things to pay your indebtedness," and that it was willing to pay him as fast as the money came in. But, as before observed, the demand of Rogers was payable not out of a particular fund or out of a percentage of receipts or funds coming in, but his demand was payable without qualification or condition. Rogers, in May, 1903, wrote to the association: "I have waited now for this payment nearly five years, and respectfully say to you that I will not wait any longer. You have property which you can sell and pay me the proceeds of such sale, which I insist that you do at once; otherwise, I shall take such action in the matter as will, in my opinion, speedily procure me my money. I trust you will not drive me to this step." Again, in September, 1903, he wrote that he was not disposed to wait longer, and to advise him what the association proposed to do. The record shows similar demands were made by him every year from 1898 to the commencement of his action. In the correspondence between the parties both Rogers and the association treated the matter as an indebtedness of the association owing by it to him. It is conceded by all parties that the money due Rogers on this indebtedness was payable to him more than five years prior to the commencement of his action. After patiently waiting all this time for his money on an indebtedness acknowledged by the

association and all parties concerned to be due him, and upon the failure of the association to pay it, when Rogers brings suit to collect it, the association and appellants together colluded to throw the association in to the hands of a receiver, in order, as they themselves said, "to stand off Rogers' suit." Equity grants relief to him who does equity, not to him who comes into court and self-confesses that he was a party to an action, which was, in his own language, "a fraud upon the jurisdiction of the court." Appellants come within the maxim, "He that hath committed inequity shall not have equity."

4. Having reached the conclusion that Rogers became a creditor in 1898, and that his claim then was due and payable, and the association having failed to pay it, we see no reason why he is not entitled to interest; and the ruling of the trial court in this respect, allowing him interest, is correct. (*Godbe v. Young,* 1 Utah 55; *Young v. Gobde,* 15 Wall. 562, 21 L. Ed. 250; 16 A. & E. Enc. L. 1004-1006.)

Our conclusion, therefore, is that the judgment of the trial court ought to be, and it hereby is, affirmed, with costs.

BARTCH, C. J., concurs.

McCARTY, J. (dissenting.)

I am not only unable to agree with my Brethren respecting some of the propositions of law announced in the foregoing opinion, but differ with them as to what the record shows some of the material facts to be in the case. The record shows that in 1893 the association sustained severe losses. Its books were destroyed by fire, and it was uncertain as to what the financial condition of the company was at that time. An auditing committee was appointed to investigate the affairs of the company and report on its condition. The report, which is in evidence, shows that the liabilities of the association exceeded its assets by nearly $10,000. As a result all of the stock was assessed fifteen per cent of the amount paid thereon by the stockholders. About this time Rogers, the plaintiff herein, was made president of the association for the purpose

of retrieving some losses sustained by the association, which position he held until March, 1899. Notwithstanding efforts were made to place the association upon a more solid financial basis, it continued to grow weaker in this respect, and after the losses referred to were sustained no stock matured for a greater amount than that paid in by the stockholders as subscription fees and the regular monthly payments.

It appears from the uncontradicted testimony that long before Rogers' stock matured, and while he was president, the policy was to carry on the business until the association could realize on its assets and wind up its affairs in such manner as would be least harmful to its stockholders. The auditor's report of March, 1897, showing the financial condition of the association, concludes as follows: "Should we be able to obtain new stockholders to offset the decrease by maturing stock, we will be in a position to continue. If not, the best thing to do to protect all stockholders is to have a receiver appointed and close up our affairs." To the same effect is the auditor's report of July, 1897, wherein he states: "We must increase our subscriptions or close up the business, which we are now gradually doing." One of the stockholders testified on this point as follows, and his testimony is not disputed: "At different times previous to 1898, the question of carrying the association along was discussed at meetings at which Mr. Rogers was president, and the question was discussed that, if we would go on and carry the association along, that there was a possibility of it paying out the money put in by realizing upon our assets. If not, the general opinion was that we would not get out even the money we put in. That was universally expressed by the stockholders as early as 1893 or 1894, and the policy agreed was to carry on the business with that end in view. We often discussed about winding up the company, and it was stated that a big loss would result to the stockholders if we attempted to wind up its affairs, but by carrying it on we would get our money out by an advance in the prices of real estate, and we held on for that purpose." Another witness testified on this branch of the case, in part as follows: "I attended meetings, after Mr. Rogers became

president, at which the financial condition of the company
was discussed. We came to the conclusion that the com-
pany's affairs were such that, if any one applied for a re-
ceiver, we would go to the wall and be unable to meet our lia-
bilities in full." Since 1895 the subscribers for stock, with
a few exceptions, as shown by the undisputed evidence in the
case, were old members of the company, who took stock to
qualify them to serve as directors. For several years prior to
the bringing of this action there were not sufficient number of
stockholders to make a full board of directors. The by-laws
provided for thirteen directors, whereas the number did not
exceed seven or eight. Prior and up to the maturity of the
stock of the twelfth series, when the stock in a series matured
and there were not sufficient funds in the treasury to redeem
or pay it off, the company, on many occasions, borrowed
money for that purpose. The record shows that the last
money borrowed by the association was used to pay off the
twelfth series of stock, which matured in 1897, and the evi-
dence further shows that the company has not loaned any
money since October of the same year.

It is not charged that there has been fraud or mismanage-
ment in the affairs of the company since the losses referred to
occurred in 1893. In fact the record shows affirmatively that
the officers in charge since said date have managed and con-
ducted the business in an honest, straightforward manner,
and have honestly endeavored to keep it a going concern until
the assets were sufficient to pay each stockholder the full
amount of his investment. And notwithstanding they made
every reasonable effort, as shown by the record, to pay off the
different series as they matured, no payments were made on
the fifteenth series until September 6, 1901, three years after
the stock matured, and thereafter all money collected by or
paid into the association, less the running expenses, was ap-
plied to the payment of this series of stock. The different
payments made to Rogers on his stock in the series up to
June 26, 1903, when the last payment was made, aggregated
$2,142. When the fifteenth series of stock matured (Sep-
tember 15, 1898), there was due and unpaid on matured

stock of the thirteenth and fourteenth series, and on stock which had been withdrawn, $1,090. This is shown by the auditor's report bearing date of September 15, 1898, introduced in evidence by respondent. And the president's report of the financial condition of the association, bearing date of March 21, 1900 (2 1-2 years after the fifteenth series matured), which report was also put in evidence by respondent, shows that there was then due and unpaid on the fourteenth series $4,000. While the books of the association showed that at the time the Rogers stock matured it was solvent, and there were undivided profits, yet the undisputed evidence in the case shows there were in fact no profits, and that profits were made to appear on the books because of the over-valuations of real estate owned by the association. Plaintiff Rogers understood this, because the record shows that, during the time he was insisting upon and demanding payment of his matured stock, he stated to the secretary of the company that the real estate held by the association was not worth more than one-half of its appraised value. And, again, in answer to a communication from the secretary, bearing date of June 16, 1903, in which he was furnished a copy of the company's financial report which contained a list of the real estate owned by the association, and the value of each separate parcel as fixed by a committee appointed for that purpose, he says: "I have had the property therein referred to appraised, and from said appraisement I would not take any of them at anything like the association's value." In fact the evidence, which is not denied or attempted to be denied, shows that after Rogers' stock matured the sales of real property made by the association showed a net loss, according to its book valuations, of $3,747.39. The record further shows that another piece of real estate, known as the "Bates Farm," which cost the association $2,339.92, and carried on its book at $2,000, would not bring on the market more than $400 or $500. And it is further shown by the undisputed evidence in the case that the association has carried on its books several other pieces of real estate at prices far in excess of their true market value. The trial court did not find there were

in fact any profits at the time Rogers' stock matured, but did find as follows: "That at the time the said fifteenth series matured, . . . . the books of the association, which carried real estate of the association at the prices the same were taken in at, and not the true market value therof, showed a profit on its business of more than $5,000." Now this finding as far as it goes, is in harmony with all the testimony given at the trial on this point. For the evidence conclusively shows that the "book values" represented the cost of the different properties to the association. Besides, the report made to the court by the receiver, which bears dates of November 14, 1903, shows that the entire resources of the association consist of the following assets: Cash and other personal property, $300; six pieces of real estate, sold under contracts on the installment plan, the title of which is still in the association, $3,682.50; and six pieces of real estate unsold, the aggregate value of which the undisputed evidence shows is not more than $1,390—making the total resources but $5,372.50, whereas, according to the amounts due respondent and the other stockholders, as found by the trial court, the liabilities of the association exceed $7,000.

Appellant's first contention is that Rogers cannot recover on his action at law for the value of his stock. The authorities all agree—in fact the doctrine is elementary— that in a corporation of this kind a stockholder holding paid-up or matured stock cannot maintain an action at law for the value of his stock, but this rule cannot be invoked in this case, because Rogers intervened in the equitable action brought by J. J. Driver, on whose petition the receiver was appointed. The court, therefore, had jurisdiction to enter the decree from which this appeal is taken.

The next question presented is, did the court err in allowing interest on the claims for matured stock from the dates when the association declared such stock matured? I recognize the general rule to be that when the constitution or by-laws of a corporation of this kind provide that claims represented by matured stock

30 Utah—14

shall be paid out of a special fund created for that purpose, or provide that a certain per cent. of the receipts and income, or a specified proportion of the cash on hand, shall be used to liquidate this class of claims, the holder of matured stock is not entitled to interest on his claim until the association has the necessary funds on hand with which to pay the claim in the order provided by its constitution and by-laws, and payment has been demanded and refused. Neither in the constitution nor by-laws of the association under consideration is there any provision limiting payment of claims represented by matured stock to any particular fund or certain per cent. of the receipts and income. The record, however, shows that it was the uniform and continuous policy and custom of the association, prior and up to the maturity of the fifteenth series, to pay off this class of claims at the time of the maturity of the stock or within a reasonable time thereafter, and, when there was not sufficient funds in the treasury to pay these claims, the association, on several occasions, borrowed money for that purpose. In other words, these claims were held by the association to be due and payable from the time the stock was declared to be matured. Not only did the association so hold, but, as stated, it adhered to and followed this custom through the whole course of its business and dealings with the holders of stock. And failure to pay off the claims represented by the fifteenth and subsequent series of stock was not because of any change in the policy of the association in this respect, but was due to the fact that the money coming into the treasury was not sufficient for that purpose. From the time the stock of the fifteenth series was declared matured by the association, the claims of fixed and definite amounts represented by this series of stock have been regarded by the association, and in fact continually acknowledged by it, to be due and payable out of the general fund without any conditions or restrictions, with the exception that stock withdrawn before maturity, as provided by the articles of incorporation, was paid off in preference to matured stock. For five years prior to the commencement of this action the association had the use and benefit of the money paid by respondent on his

stock. And under certain provisions of the constitution and by-laws, hereinafter referred to, the holders of stock withdrawn before maturity were entitled to and presumably did receive six per cent. interest on the amounts paid on their stock; and that, too, since the time when there ceased to be any accumulation of profits. Under these circumstances and conditions, according to every rule of equity and fair dealing, I think that the holders of claims represented by matured stock are entitled to interest thereon from maturity. (Endl. on Bldg. Assn's, 119; *Appeal of Mechanics' & Workingmen's Bldg. Ass'n* (Pa.), 7 Atl. 728.)

While the trial court failed to find on the question of insolvency, I think it is conclusively shown by the record and the evidence hereinbefore referred to that at the time respondent commenced his suit the association was insolvent. And the authorities uniformly hold that in case of insolvency of an association of this kind, and in the absence of any provision in the constitution or the by-laws giving one series of stock preference over others, all classes of stockholders shall share alike in the distribution of the assets, and neither is entitled to priority over the others, but each shareholder shall be entitled to receive his pro rata share of what is left after paying the expenses of winding up the concern, provided, as in this case, there are no outside creditors or other preferred claimants. In Endl. Bldg. Ass'ns, 514, 515, the rule is stated as follows:

"It is but a logical carrying out of this principle that, in cases of insolvency of associations, in which a question of distribution can arise between holders of matured and holders of unmatured stock—e. g., in a serial association—no preference is to be accorded to the former, but both classes are to share *pro rata* in what is left after satisfying outside creditors; other preferred claimants being out of the way. In short the order prescribed by the by-laws of a building association for the payment of money out of its treasury to different classes of holders of ordinary stock in the regular course of its business does not apply to the distribution of its assets when insolvent, and neither would that order apply, in such cases, to the payment of different individuals in the same class of preferred stock. The basis of distribution in such cases is not the rule of the association expressed by its by-laws standing alone, but the supreme rule of equality and mutuality; and the controlling inquiry is the amount paid by the member, not the date of the issue of his stock, nor that of its maturity, or any notice to withdraw."

"Whenever, therefore, a member appears as a claimant upon the estate of an insolvent building association, upon the ground of his stock interest, he is to be treated as a member, and not as a creditor." (6 Cyc. 165.)

The cases cited by Justice Straup in the prevailing opinion declare this same rule. In fact it is conceded that such is the law. But respondent insists and the opinion in effect holds that when his stock matured he ceased to be a stockholder, and his relation to the association was that of a mere creditor only, and, as such creditor, is entitled to all the rights and preferences that the law gives to general creditors of an insolvent association of this kind. When his stock matured and was so declared by the association, Rogers maintained a dual relation to the association of both stockholder and creditor. (Endl. Bldg. Ass'ns, 142; Thomp. Bldg. Ass'ns, 282; *Criswell's Appeal*, 100 Pa. 488.) And at no time did he cease to be a stockholder, and the record conclusively shows that at no time did the association become the purchaser of his stock, as contended by his counsel in his oral and printed arguments. On March 19, 1902, Rogers wrote to the secretary of the association respecting his claim, in part as follows: "I request that you lay before the board of directors that I insist upon, either payment at this time of my matured stock in the fifteenth series, or that the stock be taken up, and that I be given the secured note of the association. As I have explained to you orally, this stock is almost valueless to me, because it cannot be used or negotiated as collateral, and I want something which I can use." On March 26, 1902, the association, speaking through its secretary, replied to the foregoing letter as follows: "At the last meeting of the board of directors of the Ogden Building & Savings Association, I presented your matter to them in the matter of securing the payment of your unpaid balance on your matured stock in the fifteenth series, and this they refused to do, for the reason that they never have done such a thing, and, if they had to secure the amount due when the stock matured it would tie up the property, so that it would work a great detriment to the handling of the property on the same when it came to selling it. They

directed me to say that they would make all efforts consistent with the condition of things to pay your indebtedness, and anything further than that they would be unable to do." And, again, on August 20, 1902, the secretary wrote him as follows: "At a regular meeting of the board of directors of the Ogden Building & Savings Association as of this date, I brought up the matter before them concerning the execution of the association's note to you for the unpaid balance due on the fifteenth series, and the directors declined to execute the note. They say they have never done that before, and they can see no reason why they should do it now. They desire to treat you as well as any one else, and that they are doing the best they can; that they are willing to pay you as fast as the money comes in, and that is absolutely all they can do."

From the foregoing correspondence, which was introduced in evidence by Rogers, respondent herein, it clearly appears that there was neither sale nor transfer of any kind, by him, of his stock to the association. The certificates of his stock themselves, which are in evidence, bear no mark or indorsement showing a sale or transfer, and were never offered or delivered to the association, but were held by Rogers as his own individual property. That Rogers neither believed nor acted upon the theory that he had sold and disposed of his stock to the association, and thereby ceased to be a stockholder, is evident from the fact that he does not base his right of recovery upon that ground. The allegation upon which he bases his right to recover, so far as material here, is as follows: "That on said day [September 30, 1898] . . . defendant, by a duly passed and adopted resolution of its board of directors, in a regular meeting thereof then and there duly held, declared said thirty-five (35) shares of stock fully matured and then and there payable to plaintiff at the sum of one hundred and two dollars per share. . . . That defendant has failed to pay said amount, etc." Nowhere in his original complaint, nor in his complaint in intervention, does he allege a state of facts from which a sale can be inferred of his stock to the association. In fact the court did not find that the association purchased respondent's stock, or that he at any time

ceased to be a stockholder, and there is absolutely no evidence
in the record which shows or tends to show that such a sale
took place or was ever contemplated by the parties.    Nor is
there any provision in the constitution or by-laws of the asso-
ciation which gives the matured stock of one series preferred
right of payment over the matured stock of another and sub-
sequent series.

The only provisions of the constitution and by-laws which
in any way relate to the time and order of payment of ma-
tured stock and stock withdrawn before maturity are the fol-
lowing:

"Section 1.  Each and every shareholder, for each and every share of
stock that he may hold in this association, shall pay the sum of $1.00
on or before the first Tuesday in each and every month thereafter, until
the value of the whole stock shall be sufficient to divide to each share
of stock the sum of $100.00.

"Sec. 2.  When each and every shareholder, for each and every share
of stock, shall have received the sum of $100.00, or property to that
amount, this association shall close."

"Sec. 5.  Stockholders wishing to withdraw from the association after
the lapse of one year shall be entitled to receive, after one month's
notice, the full amount of the money they have paid in, with six per
cent. interest, first deducting their *pro rata* share for expenses and
losses:  Provided, however, that, if more shares shall be ordered with-
drawn than the amount of money in the treasury at such time may be
sufficient to pay, then the applicants for withdrawal shall receive the
amounts due them in the order in which the notices required have been
filed with the secretary."

It will be observed that the foregoing provisions of the con-
stitution and by-laws make no distinction whatever respecting
the order in which matured stock of the same or different se-
ries shall be paid, but section 5 fixes the priorities and order
of payment of claims held for stock that has been withdrawn
before maturity.    It would seem from this section that, if it
were intended to give any preference or priority in time of
payment to one set or class of stockholders over the others,
such preference is in favor of the stockholders holding with-
drawn stock.    Now the record shows that during the time
Rogers was president of the association, and subsequent
thereto, it was the continuous and uniform custom and course

of business of the association to pay off claims for withdrawn stock in preference to those held for matured stock, when there were not sufficient funds in the treasury to fully meet the demands made on it for these purposes; and that, too, regardless of the time when the paid-up stock matured, whether before or after the notice of withdrawal was given. Rogers understood and acted upon this custom, because the uncontroverted evidence in the case shows that long after the fifteenth series matured, and was so declared by the association, he availed himself of this business rule of the corporation and received payment for stock held by him in the seventeenth and twentieth series, which he had withdrawn before maturity. These claims were paid by the association in preference to the unpaid balances then due on matured stock of the earlier series. Therefore, even though we should follow, instead of the law as I understand it to be declared by the text-writers and adjudicated cases, the "uniform, exclusive, and continuous course of business and rule of corporate action to which all of its stockholders [including respondent] have at all times assented," as found by the trial court in determining the equities in this case, respondent is clearly not entitled to any priorities in the payment of his claim over other stockholders. First, he would not be entitled to interest on his claim, because the record shows that the association never at any time paid interest on claims for matured stock, notwithstanding interest was often demanded, while Rogers was president, and shareholders on some occasions were compelled to wait more than two years for their money after their stock had matured. This was the case with holders of stock in the fourteenth series, which matured more than a year prior to the time Rogers ceased to be a director and officer of the association. Second, a portion of the stock held by appellants matured more than two years before this suit was commenced, and the balance was withdrawn long before, and some immediately after, the bringing of the action. Now, it was the uniform "course of business and rule of corporate action" on the part of the association, when stock was withdrawn, to give it the preference in time of payment to matured stock, regardless of the time

when the withdrawal was made. That Rogers was familiar with this rule is evident from the fact that he, as hereinbefore stated, took advantage of it. And, third, if, as held by the trial court and affirmed by this court in the opinion written by Justice Straup, Rogers, when his stock matured, ceased to be a stockholder, and his relation to the association from that time on was only that of a creditor, then, in that event, J. J. Driver and Emma J. Hindley, whose stock matured long before the suit was commenced stand in the same relation to the association as Rogers, and are creditors only, and are entitled to the same treatment in the distribution of the funds. Therefore, as heretofore stated, it matters not whether we follow the law as I understand it to be laid down by all the authorities, or use as a guide the course of business and rule of corporate action of the association in dealing with its stockholders, Rogers is not entitled to any preferences or priorities in the payment of his claim over the other stockholders.

After a careful review of the record in this case, and examination of the authorities bearing upon the questions presented, I am forced to the conclusion that the case should be remanded, with directions to the trial court to modify its findings and judgment, and enter a decree permitting all the stockholders to share equally in the distribution of the fund according to the irrespective interests, as asked for by all the parties to the action except respondent.